UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                                              Case No.: 1-05-13887-dem

LAURA KELLY,                                                Chapter 7

                              Debtor.
-----------------------------------------------------------x
LAURA KELLY,

                              Plaintiff,

              v.                                                    Adversary Proceeding:

SALLIE MAE SERVICING AND                       No.: 1-05-1220-dem
EDUCATIONAL CREDIT MANAGEMENT
CORPORATION,

                              Defendants.
-----------------------------------------------------------x


## <u>DECISION AND ORDER</u>


Appearances:

Jacqueline G. Torchin, Esq.
Attorney for Plaintiff
22-11 Steinway Street
Astoria, New York 11105

Kevin Laurilliard, Esq.
McNamee, Lochner, Titus & Williams, P.C.
Attorneys for Defendant Sallie Mae Servicing
671 Broadway
Albany, New York 12207

Kenneth L. Baum, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.
Attorneys for Defendant Educational Credit Management Corp.
460 Park Avenue, 8th Floor
New York, New York 10022

DENNIS E. MILTON
United States Bankruptcy Judge

On June 15, 2005, Laura Kelly (the "plaintiff") commenced this adversary

proceeding against Educational Credit Management Corporation ("ECMC") and Sallie Mae

Servicing ("Sallie Mae")(collectively known as the "defendants"), the holders of student loans

made to the plaintiff pre-petition, requesting this Court to discharge these loans pursuant to

Section 523(a)(8) of the Bankruptcy Code.    On April 4, 2006, the Court conducted a trial.  After

consideration of the testimony of the witnesses, the documentary evidence, the arguments of

counsel and the post trial statement, the Court finds that plaintiff has not proven that she will

suffer an "undue hardship" if required to repay her student loans to ECMC and Sallie Mae.

Accordingly, plaintiff's student loan debts are not dischargeable.

## JURISDICTION

This Court has jurisdiction over this core proceeding under 28 U.S.C. §§1334(b)

and 157(b)(2)(c) and the Eastern District of New York standing order of reference dated August

28, 1986.  This Decision and Order constitutes the Court's findings of fact and conclusions of

law to the extent required by Fed. R. Bankr. P. 7052.

## BACKGROUND

On March 21, 2005, plaintiff filed a voluntary petition for relief under Chapter 7

of the Bankruptcy Code.   On June 15, 2005, plaintiff filed a complaint commencing this

2

adversary proceeding.[1]   Plaintiff seeks a discharge of her student loan obligations to ECMC[2] in

the approximate amount of $19,791.39[3] and to Sallie Mae in the approximate amount of

$31,629.93[4]. Pre-Trial Statement at 2-3.  On July 26, 2005, Sallie Mae filed an answer and a

counterclaim to the complaint.   On August 2, 2005, ECMC filed an answer.   On March 13,

2006, the parties filed a Joint Pre-Trial Statement.

On April 4, 2006, the Court conducted a trial on the complaint.  At the trial, two

witnesses, plaintiff and plaintiff's medical expert, Dr. Jonathan W. Stewart, testified.  Plaintiff is

a forty-four year old woman.  See Tr. [5] at 37:12.   She holds a bachelors degree in Fine Arts from

Yale University and a certificate in graphic design from the Massachusetts College of Art. Id. at

42:18-19,44:8-12.  She is single and has no dependents. See Joint Pre-Trial Statement ("Pre-Trial

Statement") at 3. She resides alone in an apartment located at 1929 Ditmars Blvd., Astoria, New

York.   She currently receives $1,133 per  month in Social Security Income ("SSI") from the

Social Security Administration (the "SSA"), a benefit which she has received since December

---

[1]  Plaintiff named only Sallie Mae Servicing as a party defendant in her complaint.  ECMC subsequently identified itself as a real party in interest and successfully moved for an Order adding it as a party defendant and amending the caption of the complaint.

[2]  ECMC is a student loan guarantor that took assignment of two loans from the NYHESC that are the subject of this proceeding.

[3]  ECMC holds two outstanding loans with an aggregate balance of approximately $19,791.39 as of February 15, 2006.  The loans bear a fixed interest rate of 5.3% with interest accruing at a per diem rate of $2.80.

[4]  Sallie Mae holds three outstanding loans with an aggregate balance of $31,629.93, together with unpaid accrued interest from July 18, 2005, plus attorneys' fees and costs.

[5]  References preceded by "Tr." refer to the transcript of the April 4, 2006 trial before this Court.

3

2004.[6] Tr. at 37:18.  Plaintiff's monthly expenses total $1,045.[7] Tr. at 37:21-25, 38:6.  These

expenses consists of monthly payments of $925 for rent, $20 for telephone service and $100 for

food. Id.

Plaintiff suffers from major depressive disorder and social phobia.  Tr. at 7:21.

Her symptoms at times have included a pervasive loss of interest in activities, sleep disturbance,

appetite disturbance with change in weight, decreased energy, difficultly concentrating or

thinking and thoughts of suicide. Id. at 8:8-13,9:8-11.  In 1980, plaintiff suffered her first

depressive episode which lasted for approximately six months.  In 1981, she experienced her

second depressive episode, which lasted for two years.  In 1985, she experienced her third

depressive episode which lasted for three years.  In January 1988, plaintiff was hospitalized at

Maimonides Medical Center ("Maimonides") for depression and suicidal ideation.  From

February through May 1988, plaintiff attended a psychiatric outpatient day program at

Maimonides.  In November 1990, plaintiff was hospitalized again at Gracie Square Hospital for

three weeks.  See Exhibit A to Motion in Limine dated January 17, 2006 (Patrick J. McGrath,

M.D. Evaluation dated September 15, 2004).  In early 1991, plaintiff's depression subsided.

From that point in time until September 2003, according to her own admission, plaintiff

remained "pretty much symptom free," but continued psychiatric treatment. Tr. at 43:18-25.

During this symptom free twelve year period, plaintiff held a variety of

---

[6] During the trial, plaintiff's counsel explained that although a letter from the SSA reflected that plaintiff received monthly SSI payments in the amount of $1,173.70, plaintiff's award was reduced because she chose to have medical expenses directly withdrawn from her SSI payments. Tr. at 64:1-5.

[7] Plaintiff testified that her expenses are now limited to rent, food and telephone service.  According to her testimony, she no longer spends $100/month on entertainment, $50/month on laundry, $40/month on medical and dental expenses, $50/month on transportation, $100/month on charitable contributions as listed in her Schedule J. Tr. at 37:21-25, 38:6.

employment positions which enabled her to support herself financially. Tr. at 44:20-24. From 1991 through 1996, plaintiff worked part-time as a secretary in Boston, Massachusetts. Id. at 44:1-5. In 1993, she enrolled in a part-time continuing education program for graphic design at the Massachusetts College of Art. Id. at 1-14. In 1996, she finished the program and received a certificate in graphic design. For the next two years, she worked as a freelance graphic designer. In 1998, Coco Raines hired plaintiff as a full-time graphic designer at an annual salary of $30,000.00 Id. at 45:21-25, 46:1-6. In 1999, the Museum of Fine Arts in Boston hired plaintiff as a graphic designer. Id. at 46:12-19. She worked there for four years and received an annual salary of $44,000. Pre-Trial Statement at 3; Tr. at 46:12-19. In the fall of 2003, plaintiff left her position at the museum and relocated to New York to attend graduate school at the School of Visual Arts. Id. at 49:3-6. To finance her education, plaintiff obtained students loans from Sallie Mae and the New York Higher Education Services Corporation (the "NYHESC"). Pre-Trial Statement at 2. Plaintiff failed to earn a graduate degree and withdrew from the graduate program  due to depression. In the fall of 2004, plaintiff's educational loans became due. In November 2004, plaintiff applied for and was granted a deferment of the payment of these loans. See Exhibit A of Motion in Limine; Tr.  at 40:16-17.

At trial, plaintiff testified to the steps she had taken to reduce her expenses and pay off her outstanding debt:

> Q: Have you taken any steps to reduce your expenses?
>
> A: Well, I filed for bankruptcy last year, and I'm in the
> process of applying for housing for the disabled to
> reduce my rent, and I've also – you know, I've cut
> my expenses to the bare minimum.

Id. at 38:12-16.

Despite these efforts to minimize her expenses, plaintiff has refused to consider repayment options that are available to her.[8]  The parties have conceded that plaintiff is eligible to enter the William D. Ford Direct Loan Program (the "Ford Program") with regard to her ECMC loan.  The Ford Program is a federal program that allows the Department of Education to grant a payment deferment, payment forbearance or a structured repayment program when warranted.  See 34 C.F.R. §§685.204. 695.205, 685.209 (2006).    One of the repayment programs available to plaintiff under the Ford Program is the Income Contingent Repayment Plan ("ICRP").  Under this program plaintiff's monthly payments would be twenty-three dollars and eighty-three cents ($23.83). Pre-Trial Statement at 3.

Although Salle Mae does not participate in the Ford Program, it has renegotiated repayment terms for its student borrowers.  During the trial, counsel for Salle Mae informed the

---

[8]  More troubling to this Court was the apparent failure of counsel for plaintiff to convey the defendants' proposals to her.  At trial plaintiff testified that she did not know that she was eligible to enter into the Ford Program and pay only $23.83 a month.  See Tr. at 62:3-9.

Q: Okay.  Ms. Kelly, the parties in this case, including through your counsel, have filed what's called a joint-pre trial statement which has been filed with the Court, and we have stipulated among all three parties to certain facts as being undisputed.  One of these facts is that you're eligible to enter what's [sic] called the William D. Ford Direct Loan Program, otherwise known as the Ford Program.  Are you familiar with that?

A: No, I'm not.

Q: Okay.  Well again, this is something that the parties have stipulated to, that you are eligible to enter the Ford Program.  Are you aware that entering the Ford Program you could restructure your loans and pay as little as $23.83 a month?

A: No.  I wasn't aware of that.

Id. at 53:16-25, 54:1-5.

6

Court that plaintiff had rejected all offers to renegotiate the terms of her education loans with

Sallie Mae:

> Mr. Laurlliard: ...Sallie Mae is extremely flexible as
> far as repayment terms, and I've talked to my client
> in particular in this case and they will be willing to
> accept as low payments as $50 per month from
> this debtor, and throughout this case for at least
> the last six months if not longer, I have conveyed
> that information, that flexibility to debtor's
> counsel, that they would be willing to make that
> type of compromise and flexibility, and have
> continually asked for is there any some type of
> repayment that this debtor could offer us to –
> so we could accommodate reducing her payments
> and try and get this through this, and I've just  –
> the response that I have received is that this
> debtor can't offer to even a dollar of repayment.

Tr. at 57:5-20.

Dr. Stewart testified that he had treated plaintiff since November 1, 2004. Tr. at

7:18-19.  She was enrolled in his research study which examined the combination of a

monoamine oxidase inhibitor drug called Thanylcypromine and light therapy.[9] Id. at 8:22-

25,10:19-25, 11:1-8.  The goal of this study was to see if the combination of medication and

lights would be effective when treating patients suffering from major depressive disorder who

had not responded to other treatments. Ibid.   In December 2004, plaintiff was admitted to the

New York State Psychiatric Institute for six weeks after coming to the hospital "distraught,

disheveled, saying that she had started to feel suicidal." Tr. at 9:8-11.   Plaintiff continued

treatment in the research study until May 2005. Id. at 11:17-21.   Dr. Stewart testified at trial that

---

[9] Dr. Stewart testified that light therapy is a therapy used to adjust patients' biological rhythms.  It involves having the patient sit about a foot and a half from lights having a brightness of 10,000 lux and instructing the patient to periodically glance at the lights during a timed period. Tr. at 12:14-25.

from early January through mid-February 2005, plaintiff's symptoms "dramatically" improved as a result of "the combination of the medication and the bright lights." Id. at 12:6-9,14:6-7. He "thought she was doing quite well." Id. at 12:2-4. He explained that on January 12, 2005, plaintiff's Hamilton Depression Rating Scale ("HAM-D")[10] score was a two and her Beck Depression Inventory ("BDI")[11] score was zero. Id. at 17:4-24,18:1-25. On February 17, 2005, plaintiff's HAM-D score was zero, indicating no symptoms of depression. Id. at 19:6-12.

        On April 3, 2006, Dr. Stewart examined plaintiff for the purpose of preparing for trial. Tr. at 24:3-5. Stewart testified that plaintiff's HAM-D score was seventeen which indicates that she was "moderately depressed." Id. at 24:8-11. He mentioned that he thought one of the factors contributing to her relapse was the fact that she had stopped consistently using the light treatment. Id. at 31:11-14, 32:1-12.

> The Court: You indicated that the – with regard to Ms. Kelly that the light treatment appear to be helpful, but that she couldn't bring herself to use it. What does that mean?

---

[10] The Hamilton Depression Rating Scale ("HAM-D") is a twenty-one question multiple choice questionnaire which physicians use to rate the severity of a patient's depression. To administer the test the physician must interview the patient and then fill out the questionnaire based on the patient's symptoms. The first 17 questions contribute to the total score and questions 18-21 are recorded to give further information about the depression such as if paranoid symptoms are present. The 17 items are rated on either a 5-point (0-4) or a 3-point (0-2) scale. In general, the 5-point scale items use a rating of 0=absent; 1 = doubtful to mild; 2= mild to moderate; 3= moderate to severe; 4= very severe. A rating of 4 is usually reserved for extreme symptoms. The 3-point scale items use a rating of 0=absent; 1= probable or mild; 2=definite. Higher total scores indicate more severe depressive symptoms. See Tr. at 16:23-25,17:1-13. See also, Andrew M. Colman, *Hamilton Depression Rating Scale*, A Dictionary of Psychology, Oxford University Press 2006.

[11] The Beck Depression Inventory ("BDI") is a twenty-one question multiple choice self-rated test which purports to measure the presence and degree of depression in adolescents and adults. When the test is scored, a value of 0 to 3 is assigned to each answer and then the total score is compared to a key to determine the depression's severity. Higher total scores indicate more severe depressive symptoms. See Tr. at 18:7-15; See also, Andrew M. Colman, *Beck Depression Inventory*, A Dictionary of Psychology, Oxford University Press 2006.

> The Witness: Well, as I suggested with the last counselor, it seems clear that the timing of when you use the lights is very important, and we think that's because the lights are correcting abnormal rhythms of various things in the body, and if you don't take them at the right time, they're not going to correct those rhythms, and the time for her, as I understand it, is 7:30 in the morning, and she finds it difficult to get to bed before about 3:00 in the morning. So she would have to get up about four hours after going to bed, and I know I'm –I have trouble with that, so I can appreciate if someone else does.  So she sometimes gets up and uses them at 7:30 or 8:00 in the morning, but some mornings she doesn't -
>
> The Court: Is that –
>
> The Witness: and you need the consistency of every morning for them to work properly.
>
> The Court: Is this a treatment that is done at home?
>
> The Witness: Yes, sir.

Tr. at 30:18-25, 31:1-15.

Based on these findings, Dr. Stewart concluded that in plaintiff's current condition she could not handle working a full-time job. Id. at 9:19-21.  He based his opinion on the fact that plaintiff has difficulty being around people and also has "tremendous trouble getting herself places and getting herself to actually do things." Id. at 26:19-25.    However, Dr. Stewart acknowledged that if the plaintiff found the task or appointment important enough, plaintiff could get to a place on time.  Tr. at 27:1-5.  For example, Stewart acknowledged that plaintiff was in Court on time for her ten o'clock hearing.  Id.

Dr. Stewart further testified that psychiatry is "more of an art than a science" and "the current treatments leave a lot to be desired."  Id. at 30:10, 31:3-4   To date, plaintiff's

depression has "waxed and waned." Tr. at 8:18-19.  Therefore, Stewart concluded that he

expects plaintiff's depression to continue on its past course "unless we find successful

intervention." Id. at 8:16-21.  He explained that "[p]rediction is a[] risk in psychiatry, but as best

we can tell, the past predicts the future."   Id. at 8:2-3.   He testified that a patient with major

depressive disorder who had a consecutive number of "symptom free" years would likely have

another long period of well being:

> Q: If - if you had a patient who for 12 years was very
> functional and worked as was employed for 12 years,
> do – would you then say that there's a good chance
> that this same patient might have another 12 years
> in the future where they could be emotionally
> functional?
> ....
>
> A: I think it's likely they'll get back to that.

Tr. at 19:23-25, 20:1-9.

At the conclusion of the testimony, the parties rested.  The Court instructed

counsel for plaintiff to file a post trial memorandum, if any, on or before May 4, 2006 and

counsel for the defendants to file a post trial memorandum, if any, on or before May 25, 2006.

Only counsel for the defendants filed a post trial memorandum.   The Court then took the matter

under advisement and reserved decision.

### DISCUSSION

As a general rule, a debtor who seeks relief under the Bankruptcy Code cannot

have her student loan debt discharged.   Section 523(a)(8) of the Bankruptcy Code provides:

> A discharge under section ... 1328(b) of this title does not
> discharge an individual debtor from any debt ... for an
> educational benefit overpayment or loan made, insured

> or guaranteed by a governmental unit, or made under
> any program funded in whole or in part by a governmental
> unit or nonprofit institution, or for an obligation to repay
> funds received as an educational benefit, scholarship or stipend,
> unless excepting such debt from discharge under this paragraph
>  will impose an undue hardship on the debtor and the debtor's
> dependents.

11 U.S.C.A. §523(a)(8).

Establishing an undue hardship is a "heavy burden"[12] for any debtor.  In this

Circuit, the existence of "undue hardship" is determined according to the three prong test

announced in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395,1396 (2d Cir.

1987).  According to Brunner, to demonstrate undue hardship, a debtor must prove that (1) she

cannot maintain, based on current income and expenses, a "minimum" standard of living for

herself if forced to repay the loans; (2) additional circumstances exist indicating that this state of

affairs is likely to persist for a significant portion of the repayment period of the student loans;

and (3) she has made good faith efforts to repay the loans. Id.   Preponderance of the evidence is

the standard of proof used in student loan discharge cases.  Grogan v. Garner, 498 U.S. 279,291,

111 S.Ct. 654, 112 L.Ed.2d 755 (1991); In re Thoms; 257 B.R. 144,148 (Bankr. S.D.N.Y. 2001);

In re Fowler, 250 B.R. 828, 830 (Bankr. D.Conn. 2000).  The failure to prove any of the three

elements is fatal to a plaintiff's claim.  In re Williams, 296 B.R. 298, 302 (Bankr. S.D.N.Y.

2003) ;   In re Faish, 72 F.3d 298, 306 (3d Cir. 1995).

------

[12] Congress adopted Section 523(a)(8) to reduce the "rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of educational loan debts", and thereby assure that students attending school would have reasonable access to low interest rate loans. In re Williams, 296 B.R. 298, 302 (Bankr. S.D.N.Y. 2003); In re Wallace, 259 B.R. 170, 179 (C.D. Ca. 2000).

**A.  The First Prong – Plaintiff cannot maintain, based on
current income and expenses, a minimal standard of living
for herself if forced to repay the loans**

The first prong of the <u>Brunner</u> test requires that plaintiff prove that she cannot

maintain a minimal standard of living based on her current income and expenses if forced to

repay the student loans.   "[T]his test requires the Court to examine the [d]ebtor's current income

and expenses and determine a flexible minimal standard of living level sensitive to the particular

circumstances of each case through the application of common sense." <u>In re Porrazzo</u>, 307 B.R.

345, 348 (Bankr.  D.Conn. 2004)(internal citations omitted).  While "this minimum standard of

living test requires more than a showing of tight finances," it "does not require the [d]ebtor to

demonstrate that repayment of the loan would cause [her] ... to live at or below the poverty line."

<u>In re Faish</u>,72 F.3d at 306; <u>In re Elmore</u>, 230 B.R. 22, 26 (Bankr. D.Conn. 1999);  <u>In re Stein</u>,

218 B.R. 281, 287 (Bankr. D.Conn. 1998).

The Court has little difficulty determining that the plaintiff has satisfied the first

<u>Brunner</u>  prong.  Plaintiff's sole source of income is SSI.  She receives $1,133 per month.

Plaintiff testified at trial that her recurring monthly expenses, without any payments on her

student loans, consist of payments for rent ($925), food ($100) and telephone ($20).  These

monthly expenses total $1,045.00, leaving her $98.00 in excess income over expenses.  Although

plaintiff  would appear to have sufficient funds to repay her loans each month if she enrolled in

the ICRP of the Ford Program ($23.58/month) and renegotiated her debt with Sallie Mae

($50.00/month), the Court understands that plaintiff might have other expenses such as laundry

and transportation that she did not accurately account for in her budget.  Plaintiff maintains a

minimum standard of living devoid of excessive spending on discretionary items, and neither

12

defendant has suggested that she has failed to meet the first prong of the <u>Brunner</u> test.  The Court

finds that if forced to repay her debt to ECMC and Sallie Mae, plaintiff would not be able to

maintain a minimal standard of living, and has satisfied the first prong of the <u>Brunner</u> test.

**B. The Second Prong –  Additional circumstances do not
exist indicating that this state of affairs is likely to persist
for a significant portion of the repayment period of the
student loans.**

When the Court finds that plaintiff has shown by sufficient evidence that she has

satisfied the first prong of the <u>Brunner</u> test, the Court then proceeds to assess the likely

persistence of that state of affairs.  The second prong of the <u>Brunner</u> test, sometimes referred to

as "the additional circumstances test," requires plaintiff to show that her current state of affairs

will not improve for a significant portion of the student loan repayment period.  The second

prong puts into effect "the clear congressional intent exhibited in section 523(a)(8) to make the

discharge of student loans more difficult than that of other nonexcepted debt."  <u>Brunner</u>, 831

F.2d at 396.   The uncontested evidence here is that plaintiff has suffered from depression and

related emotional and psychological disorders since she was approximately eighteen years old.

Her symptoms began when she was an undergraduate and have "waxed and waned" over the last

twenty-six years, with long periods of worsening and improvement.

Despite this disability, plaintiff has managed to obtain a bachelor of arts degree

from Yale University and successfully complete a graphic design certificate program at the

Massachusetts College of Art.   Moreover, plaintiff has been gainfully employed and financially

self sufficient from 1991 through 2003, a span of twelve years.  From 1991 through 1996,

plaintiff worked as a part-time secretary in Boston, Massachusetts and also completed a

13

continuing education program where she earned a graphic design certificate.  From 1996 through 1998, plaintiff worked as a freelance graphic designer.  In 1998, she worked on a full time basis for Coco Raines and earned $30,000 per year.  In 1999, the Museum of Fine Arts in Boston hired plaintiff as a full time graphic designer and paid her an annual salary of $44,000.  She stayed at this job until the fall of 2003, when she decided to relocate to New York City to pursue graduate school.

The Court concludes that plaintiff's alleged inability to work will not likely persist for a significant portion of the repayment period.  Plaintiff's expert witness, Dr. Stewart, testified that plaintiff's future prognosis is based on her medical history. See Tr. at 19:20-23.  Thus, he acknowledged that if plaintiff had been highly functional in the past, she would likely be highly functional in the future. Id. at 19:23-25, 20:1-9.

The Court is likewise not convinced that plaintiff cannot work in some capacity at the present.   Dr. Stewart testified that plaintiff is unable to work a full-time job in her current condition mainly because she has trouble getting herself places on time. Id. at 26:10-25.   Dr. Stewart further testified that plaintiff's lack of punctuality is primarily due to her inability to fall asleep before three in the morning.  Tr. at 13:20-25.   Dr. Stewart acknowledged that plaintiff has been able to get to places on time if the task were important enough.  For example, he testified that plaintiff appeared on time for the start of her Trial, which was scheduled for 10:00 a.m.  Id. at 27:4-5.

Based on these facts, the Court finds that the plaintiff has not proven that her sub-minimal standard of living will persist for a significant portion of the repayment period of the student loans.

**C.    Plaintiff Has Not Demonstrated Good Faith Efforts to
Repay Student Loans**

The third prong of the <u>Brunner</u> test requires the plaintiff to prove that she has

made good faith efforts to repay her student loans.  "This prong of the analysis recognizes that

undue hardship encompasses a notion that the debtor may not willfully or negligently cause [her]

own default, but rather [her] condition must result from factors beyond [her] reasonable control."

<u>In re Pobiner</u>, 309 B.R 405, 420 (Bankr. E.D.N.Y. 2004) <u>citing</u> <u>In re Elmore</u>, 230 B.R. at  27

(internal citations omitted).  It also "fulfills the purpose behind the adoption of section

523(a)(8)[,which was] a response to a rising incidence of consumer bankruptcies of former

students motivated primarily to avoid payment of education loan debts." <u>In re Wallace</u>, 259 B.R.

at 179 <u>citing</u> <u>In re Pena</u>, 155 F.3d at 1111)(internal quotations omitted).

ECMC and Sallie Mae have contended that plaintiff's conduct during the

pendency of her bankruptcy reflects a lack of good faith.  They have asserted that plaintiff's

failure to explore her repayment options under the Ford Program and failure to negotiate

repayment terms with Salle Mae militates against a finding that plaintiff used good faith efforts

to repay her loans.  <u>See</u> Post-Trial Memorandum filed on May 25, 2006 at 5-6.  To determine a

debtor's good faith a court should evaluate how the debtor responded to available repayment

opportunities. See <u>In re Wallace</u>, 259 B.R. at 184.  See e.g. <u>In re Thoms</u>, 257 B.R. at 150 (debtor

failed to prove undue hardship, in part, because she did not attempt to avail herself of income

contingent repayment plans); <u>Naranjo v. Penn Higher Educ. Assistance Agency</u>, 2000 WL

33155259, *9 (Bankr. C.D. Cal. December 8, 2000)(debtor's reluctance to enter into a program

15

like ICRP has been considered an element of bad faith).  One court has described the "good

faith" prong of <u>Brunner</u> as:

> [A] moving target that must be tested in light of
> the particular circumstances of the party under
> review... [T]he characterization of that effort
> must reflect not only a party's objective conduct,
> but also the environment in which that conduct
> occurs.  In those instances in which the debtor
> cannot maintain a minimal standard of living
> without payment of student loans, the
> demonstration of good faith does not necessarily
> command a history of payment.  It does require a
> history of effort to achieve repayment, such as
> when a borrower diligently uses a deferment
> period to attempt the reorganization of her
> financial affairs.

<u>In re Wallace</u>, 259 B.R. at 184 (citing <u>In re Maulin</u>, 190 B.R. 153, 156 (Bankr. W.D.N.Y. 1995).

Here, plaintiff has sought deferments, but as previously discussed, has not

attempted to renegotiate the repayment terms of her loans or avail herself of the Ford Program.

Based on plaintiff's current income, the ICRP plan would enable her to repay her $19,791.49

debt to ECMC in full for $7,149.00 ( $23.83 per month for 300 months).   Sallie Mae has offered

similarly reduced repayment terms.    However, plaintiff has rejected these offers.   While

plaintiff may not as of this time received a financial benefit from the education for which she

incurred the student loan obligations,  her inability to benefit financially from the year of study is

immaterial.  <u>Norasteh v. U.S. Dept. of Ed.</u>, 311 B.R. 671,677 (Bankr. S.D.N.Y. 2004); See e.g.

<u>In  re Brunner</u>, 46 B.R. 752, 756 n.3. (S.D.N.Y. 1985)(a court may not consider whether the

particular education has been of any use to the debtor).  "The borrower rather than the taxpayers must bear the risk that [her ] ...education will pay dividends." Id.

Finally, the ratio of a debtor's student loan debt to total debt to be discharged is considered when evaluating good faith.  In re Pobiner, 309 B.R. 421.  See e.g. In re D'Ettore, 106 B.R 715 (Bankr. M.D.Fla. 1989)(to determine debtor's good faith, the court should examine whether the dominant purpose of filing was to discharge student loans and the ratio of the student loans to the total indebtedness); In re Holzer, 33 B.R. 627,632 (Bankr. S.D.N.Y. 1983) (debtor must establish the purpose in filing the petition was not to discharge student loan debt). Here, plaintiff's student loan debt constitutes more than seventy per cent (70%) of the debt that she originally sought to discharge.

Under the facts and circumstances of this case, the Court finds that plaintiff has failed to establish that she has made good faith efforts to repay her student loans.

## CONCLUSION

For the reasons set forth above, the Court finds that plaintiff has not met her burden pursuant to Section 523(a)(8) of the Bankruptcy Code to demonstrate "undue hardship." Accordingly, plaintiff's student loan debts to ECMC and Sallie Mae are not dischargeable.

IT IS SO ORDERED

Dated:          Brooklyn, New York
                September 21, 2006

                                    s/Dennis E. Milton
                                    DENNIS E. MILTON
                                    United States Bankruptcy Judge

17